We'll hear argument next in Case 18-107, R.G. & G.R. Harris Funeral Homes v. EEOC. Mr. Cole? Mr. Chief Justice, and may it please the Court, Amy Stevens is a transgender woman. She was a valued employee of Harris Funeral Homes for six years, until she told her boss that she was going to live and identify as a woman. When Harris Homes responded by firing her, it discriminated against her because of her sex for three reasons. First, in firing her for failing to conform to its owner's explicitly stated stereotypes about how men and women should behave, it discriminated against her in the same way that Price Waterhouse discriminated against Anne Hopkins for failing to walk and talk more femininely. It can't be that Anne Hopkins would lose her case on the same facts were she transgender. Second, Harris Homes fired her for identifying as a woman only because she was assigned a male sex at birth. In doing so, it fired her for contravening a sex-specific expectation that applies only to people assigned male sex at birth, namely that they live and identify as a man for their entire lives. That is disparate treatment on the basis of sex. Third, Harris Homes fired her for, in its owner's words, changing her sex. That's discrimination in the same way that firing someone for changing their religion would be religious discrimination. That Harris Homes would fire both transgender men for being insufficiently feminine and transgender women for being insufficiently masculine is, as the government concedes, two acts of sex discrimination, not a defense. None of these arguments ask this Court to redefine or, in Judge Posner's words, update sex. They assume arguendo that sex means, at a minimum, sex assigned at birth based on visible anatomy or biological sex. Roberts. I understand that as the argument, and I believe it's the same as in the prior case. But does that argument hold up when you get to specific work requirements in other words, if the objection of a transgender man transitioning to woman is that he should be allowed to use, he or she should be allowed to use the women's bathroom? Now, how do you analyze that? I understand how you analyze status, as it were, and maybe that's hiring and firing on the basis, treating it as just on the basis of sex. But when you get to specific policies, does that hold true? So, first of all, Your Honor, how you answer this case will not resolve how you answer that case. Whether you rule against us or for us, the next case will arise in the following sense. A dress code that distinguishes on the basis of sex obviously is because of sex. The question, then, is does it impose a discriminatory term and condition? And as this Court said in Burlington Northern, to discriminate is not just to differentiate, but to differentiate in a way that injures. Roberts. I think you're missing my point, maybe because it wasn't carefully expressed. But it's can the claim be, I mean, I understand when you say you're dealing with transgender status and you can't discriminate on that basis with the basis of status. But when you get to the actual policy, do you analyze it as discrimination on the basis of sex, carrying forward your reasoning at the outset, or on the basis of transgender status? So if the objection of the transgender individual is that I want to use a bathroom consistent with my gender identity rather than biological sex, do you analyze it as the affecting based on the transgender status, or do you analyze it on the basis of biological sex? So the — I think our argument rests on biological sex or what we think is more accurately referred to as sex assigned at birth. But here's the thing. If there is a — this case asks whether when someone fires someone because they're transgender or because they fail to conform to sex-based stereotypes, is that because of sex? That's what this case asks. Obviously, a sex-specific restroom policy is because of sex. So you're not — we're not answering that question. It's because of sex. Then the question is — Roberts. Now, just if I could interrupt so I can follow. It's because of sex. Because of biological sex. And so — but if you analyze it because of sex, then I think has been pointed out, there's no disadvantage whether you're a man or a woman. But if you analyze it on the basis of transgender status, there is, because you want to use the women's restroom and be biologically male. So when it's analyzed on the basis of sex, there's no problem. But when it's analyzed on the basis of transgender status, it presents a whole different case. So I don't think so, Your Honor. I think — look, anybody can challenge a sex-specific rule. A transgender person can challenge a sex-specific rule. A non-transgender person can challenge a sex-specific rule. What this Court said in Burlington Northern and in Oncal is that to decide whether something discriminates that refers to sex is you have to ask whether — not just whether it differentiates, but whether it differentiates in a way that injures. And you answer that question by asking, would a reasonable person in the plaintiff's position experience a significant or a trivial harm? Now, in most instances — And that's the question I posed to Ms. Carlin earlier. Right. And we went around the tree a bit. But ultimately came to, I believe, a submission that a reasonable person in the transgender plaintiff's position would be harmed if he or she were fired for failing to follow the bathroom rules or some sort of dress code that's not otherwise objectionable, along the lines of — that were present in the facts of this case, where men and women had rather traditional options available to them. But — so is that your answer as well? That is my answer, and here's why. Let's say we have a sex-specific dress code, and you require me, or you, to follow the male dress code. Most instances, that's not going to be a significant harm. That's going to be a trivial harm, as the Court talked about in Burlington Northern. Therefore, it's not discrimination, even though it differentiates on the basis of sex. But if you ask you or me to dress as a woman, we would consider that a significant harm. And when you ask a transgender person to dress in a way that is contrary to their sense of gender identity, you have imposed a significant harm. And the harm is because of sex, based on biological sex, as Justice — as Chief Justice Roberts identified. Mr. Koh, let's not avoid the difficult issue, okay? You have a transgender person who, rightly, is identifying as a woman and wants to use the woman's bedroom. Rightly, wrongly, not a moral choice, but this is what they identify with. Their need is genuine. I'm accepting all of that, and they want to use the woman's bathroom. But there are other women who are made uncomfortable, and not merely uncomfortable, but who would feel intruded upon if someone who still had male characteristics walked into their bathroom. That's why we have different bathrooms. So the hard question is, how do we deal with that? And what in the law will guide judges in balancing those things? That's really what I think the question is about. Well, that is a question, Justice Sotomayor. It is not the question in this case, because — Mr. Koh, that's — yes. Because once we decide the case in your favor, then that question is inevitable. No, I think even if you decide the case against — Justice Sotomayor, it may not be in — if they're single-sex bathrooms, there might be one answer, meaning what harm would the other women, reasonable women, feel if a man's using a single-sex bathroom. It might be another if it's two locker rooms, men and women, girls and boys, and who walks in is something you can't control. That's what the question is, I think. But, Justice Sotomayor, the reason deciding this case will not decide that case because — It won't decide that case. It won't decide. Even if you rule against us, that case can arise because it is a sex-specific rule, and anyone who is affected by a sex-specific rule can argue that it discriminates against them because a reasonable person in their shoes would experience a significant harm. I understood you to say, maybe I didn't understand you correctly, that if your client had been fired for using the woman's bathroom, that would be a violation of Title VII. So what I said was, yes, that — in our view, were we litigating that case here, which we aren't. They admitted that the restroom was a hypothetical issue and not a reason why she was fired. But were we litigating that case? I think the question would be not whether the policy was because of sex, which is the question would be, does imposing that restroom policy, which is obviously because of sex, impose a discriminatory injury on an individual? And, again, if you require me to go to the women's restroom, that's a serious issue. So what you're saying is that we're stuck with that question regardless of how we decide this case. Whether you rule for or against us, this case — Well, but the difference is that part of the argument, at least, is that the term biological sex includes sexual orientation. And if that is the case, if we analyze the bathroom case purely on the basis of biological sex, maybe you have one answer. But if you analyze it in terms of transgender status, you have a different answer, because men and women who identify with their biological sex aren't disadvantaged, whether they use the men's room, you know, they each can use their own restroom. But the issue seems is quite different if you're dealing with a transgender individual who wants to use the restroom of their gender identity, contrary to their biological sex. And the question is, how do you analyze that? You say in each case it's on the basis of sex. Do you analyze it on the basis of biological sex, or are you analyzing it on a different basis, because they present different issues? Your Honor, for this — for purposes of this case, all we are arguing is that Title 7's reference to sex at least includes what you're calling biological sex, what we call sex assigned to a person. But, Mr. Poole, you can go further than that. For purposes of the next case, all it includes is biological sex as well. Yes, exactly. All that you're saying is, yes, that because of sex means because of biological sex, regardless of whether the transgendered person or whether a non-transgendered person brings this claim about the restroom. And in your case — Okay. So then it's — then it's an easy case, right? Yes. Because if it's just biological sex, there's no problem because there's no disadvantage. But if you're looking at transgender status, there's a huge problem because it's not biological discrimination, or the claim is going to be different. Certainly a transgender individual can bring the claim under Title 7 that it discriminates on the basis of sex. Right. But if the claim is it discriminates against me because I'm a transgender individual, that's not your claim. But that's not — the claim here is that you are treating — that Harris-Holmes is treating Amy Stevens differently because of her sex assigned at birth. If she had a female sex assigned at birth, she would not be fired. Because she had a male sex assigned at birth, she is fired. That is discrimination because of sex. That's all the — And that doesn't decide the bathroom question, because the bathroom question — there's no doubt that separate sex bathrooms are because of sex. The question is — Because of biological sex. Because of biological sex, as you use it. Because the question then is, does it impose a de minimis burden, a trivial burden, as the Court said in Burlington Northern, or does it impose a significant burden? In Burlington Northern, the Court said the same rule can impose a significant burden as to some people and a trivial burden as to others. A schedule change might be trivial for a worker with no kids, but a worker with kids, it would be significant. I imagine you would say that excluding a transgender woman from the woman's bathroom would be far more than a de minimis burden on that person. But let me move out of the — Exactly. Let me move beyond the bathroom to another example. And it's not before us, but it will be coming. So a transgender woman is not permitted to compete on a woman's college sports team. Is that discrimination on the basis of sex in violation of Title IX? So Title IX is a different statute with regulations that explicitly permit sex-segregated teams when competitive skill or contact sports are involved. So, again, the question of sex segregation is a different statute. Ginsburg's question is, if a woman is transitioned from male to female, and wants to play on the female team, she's not questioning separate male-female teams, but she was born a man, she has transitioned, she wants to play on the female team. Does it violate Title IX, which prohibits gender-based discrimination? Right. And I think the question, again, would not be affected, even, by the way that the Court decides this case, because the question would be, is it permissible to have sex-segregated teams? Yes, where they involve competitive skill or contact sports. And then the question would be, how do you apply that permissible sex segregation to a transgender individual? And it may be that because Title IX recognizes concerns about competitive skill in contact sports, that it's permissible. It may be that it's not permissible. But this case just asks, when you fire somebody because you say he was going to represent himself as a man, because she was using the name Amy and that's not permissible because he's a man, is that sex discrimination? Yes, that is sex discrimination. Whether when you have a policy that permits sex segregation, how that applies to transgender people is just a different question. It is not answered one way or the other by this case. You would still have to ask, is it fair to keep that person off of the team, just like it's fair to keep a man off of that team? The stereotypes in this case are every bit as strong as they were in Price Waterhouse. In fact, they're stronger, because in Price Waterhouse, you had to infer from statements that non-decision-makers were making about why Ann Hopkins was fired. Here, Mr. Rost has made his sex stereotypes absolutely clear. And the government and petitioner concede that transgender people are not excluded from the statute. It's not like the German police officer. They concede transgender people can bring sex discrimination claims. She has brought a sex discrimination claim because she was fired for failing to conform to sex-based stereotypes explicitly stated by her employer that it can't be, again, that Ann Hopkins would lose her case were she transgender. It's not okay to employ sex stereotypes against an employee until that employee becomes transgender. And at the end of the day, the objection to someone for being transgender is the ultimate sex stereotype. It is saying, I object to you because you fail to conform to this stereotype, the stereotype that if you are assigned a male sex at birth, you must live and identify for your entire life as a man. That is a true generalization for most of us, but it is not true for 1.5 million transgender Americans. And so to say, we're going to fire you because you fail to accord to a generalization about how people who are assigned a particular sex based on visible anatomy at birth have to live their lives for the rest of their lives is sex discrimination. It's also sex discrimination because she was clearly treated differently because of her sex assigned at birth. Imagine an employer who had six Amy's, and he invited all six Amy's in, and he said, you know, I just want to know what your sex assigned at birth was. And five of them say, well, I was assigned female at birth. And one says, I was assigned male at birth. And then he fires the one who says, I was assigned male at birth. Obviously, that person is fired because of her sex assigned at birth. And as we saw from the prior argument, it need not be the only justification. It need be only one justification. And the notion that somehow discriminating against someone because they're transgender is not discrimination, discriminating against them because of their sex, I think falls apart. Because to say I'm discriminating against you because you are transgender is to say I am treating you differently from other people who have the same gender identity because of your sex assigned at birth. So again, we're not asking that you update the statute. We're not asking that you redefine sex. We are accepting the narrowest, for purposes of this case, the narrowest definition of what Harris-Holmes did here without it treating her differently because of her sex assigned at birth. Kagan. There seems, Mr. Cole, to be this dispute among the parties in this case as to what the basis of the firing was, whether the basis of the firing was the violation of the dress code, particularly, or whether it was broader than that, was being transgender. What should we make of that dispute? Well, I think the Sixth Circuit expressly said that the reasons for firing her extended beyond the dress code. Counsel for Harris-Holmes conceded at oral argument in the Second Circuit that she would have been fired if she showed up as a woman even if she were following the dress code. And that's in Petitioner's Appendix 66A from the Sixth Circuit decision. And he fired her after he got the letter saying, I am coming out as a woman and I'm going to heretofore be called Amy, without any discussion of the dress code whatsoever. So this is a case in the case. Mr. Cole, though, your argument, though, doesn't turn on that. I mean, as I understand it again, that if the firing had been solely what the employer claims, the basis of the dress code only, the result would be the same. And I guess I'd just like you to have a chance to respond to Judge Lynch and his thoughtful dissent in which he lamented everything you have for us, but suggested that something as drastic a change in this country as bathrooms in every place of employment and dress codes in every place of employment that are otherwise gender neutral would be changed, that that's an essentially legislative decision. Your Honor. Judge Lynch is a very thoughtful judge and wrote a very thoughtful opinion that I think he probably regretted having to write. What do you say to him? I say that recognizing that transgender people have a right to exist in the workplace and not be turned away because of who they are does not end dress codes or restrooms. There are transgender lawyers in this courtroom today. Of course there are. That's not the question, Mr. Cole. Mr. Cole, the question is a matter of the judicial role and modesty in interpreting statutes that are old. And that's the question he posed. Right. Nobody is questioning, and he certainly did not, the legitimacy of the claims and the importance of them. So I think the question is a matter of judicial interpretation. Yeah. If you wish to address it. Two answers to that, Your Honor. First, on the question of judicial interpretation, we are not asking you to apply any meaning of sex other than the one that everybody agrees on as of 1964, which is sex assigned at birth, or as they put it, biological sex. We're not asking you to rewrite it. Second. I agree with that. Second. The question, though, again, and I'm sorry to pose it, but I'm going to give you one more shot. Yeah. All right. When a case is really close, really close on the textual evidence, and I assume for the moment, I'm with you on the textual evidence, it's close, okay? We're not talking about extra-textual stuff. We're talking about the text. It's close. A judge finds it very close. At the end of the day, should he or she take into consideration the massive social upheaval that would be entailed in such a decision and the possibility that Congress didn't think about it, and that that is more appropriate in a legislative rather than a judicial function? That's it. It's a question of judicial modesty. So first of all, federal courts of appeals have been recognizing that discrimination against transgender people is sex discrimination for 20 years. There's been no upheaval. As I was saying, there are transgender male lawyers in this courtroom following the male dress code and going to the men's room, and the court's dress code and sex-segregated restrooms have not fallen. So the notion that somehow this is going to be a huge upheaval, we haven't seen that in 20 years, there's no reason you would see that in people. Transgender people follow the rule that's associated with their gender identity. It's not disruptive. And as to whether this is a question of interpretation, it is absolutely a question of interpretation. How in the world can the Court interpret Title VII to say that Ann Hopkins can't be fired for being insufficiently feminine, but my client can be fired for being insufficiently masculine? There's no textual basis for drawing that distinction whatsoever. And that's because our argument rests on text meaning, at a minimum, sex assigned at birth or biological sex, and everybody agrees. Did you want to address Judge Lynch's arguments or not? I thought I was. Number one, it won't – it's not disruptive that transgender people exist in this world and we still have sex-segregated dress codes. And number two, it's not asking you to address a policy question that would be more appropriate to Congress, but asking you to interpret the statute as it is written and as everybody agrees it applies to sex assigned at birth. Thank you. Roberts. Thank you, counsel. Mr. Bursch. Thank you, Mr. Chief Justice, and may it please the Court. Treating women and men equally does not mean employers have to treat men as women. That is because sex and transgender status are independent concepts. Now, in the context of this case, Title VII gives Tom Ross the ability to consider how enforcement of a sex-specific dress code would impact all his employees and grieving clients. But the Sixth Circuit imposed a new restriction, and its holding destroys all sex-specific policies and even BFOQs while undermining the protections that Title VII provides. If you accept at face value Stephen's concession that sex means biological males and females, then the funeral home wins. So my friend Mr. Cole redefined sex to include transgender status in two respects. First, my friend's but-for test would mean that a woman's overnight shelter must hire a man who identifies as a woman to serve as a counselor to women who have been raped, trafficked, and abused, and also share restroom, shower, and locker room facilities with them. That is because but-for the man's sex, he would be allowed to hold that job and to use those facilities. The purportedly simple test does not get to the ultimate inquiry of whether men are being treated less favorably than similarly situated women because of sex. That does not reflect the original public and legal meaning of a statute promoting women's equality. Second, under my friend's stereotyping logic, it is always illegal stereotyping to apply sex-specific policies based on biological sex. And that's why he's wrong to say this case isn't about showers and overnight facilities and sports. Every single one of those is impacted if you're talking about a sex-specific policy. What Title VII says is that sex-based differentiation is not the same as sex discrimination. And that's why Ms. Carlin agreed that this Court's sex-specific dress policy doesn't violate Title VII. And though Congress has added classifications to cover transgender status in other statutes, it has rejected more than a dozen proposals here. Title VII --" Breyer, you've made the argument, which I call the Parade of Horribles argument. But you've heard, as I have for the last hour and a half, the response, which is that isn't this case, that many of the things that you are worried about would be taken care of by bona fide occupational qualification, that other of those things would be taken care of by the need to show harm as well as to show difference, and that there could be, though we haven't done it and I'm not advocating it, yes or no, the possibility of bringing into such cases comparative harms. And all those things are open. And if you say that the lower court decided them, this is not the lower court. I take it that we are deciding simply whether it falls within the words, sex discrimination. And if it does, we are not saying whether there has been harm, whether there has been a vote BFOQ, whether there is comparative harm, et cetera. That's what I've heard. Now, what do you say to that? Justice Breyer, that is incorrect, because when a biological male is refused access to the women's restroom, the male would say that was an injury. Yes. Of course he would say it was an injury. And there is no BFOQ. And the other side would say, I'm sorry, but there are serious injuries on the other side, and therefore it is a BFOQ, okay? And so this is not that case. We do not have to decide it. And I don't see why or how. You can assume the answer and then build your argument on an answer that I certainly haven't given. It's their answer, and here is why. If Stevens is right that you cannot apply a sex-specific policy to those who identify as the opposite sex, then you cannot apply that policy to anyone, because that itself would be sex discrimination. Right. Just on the off chance that I feel we do not have to decide that matter in this case, have you other arguments that would favor your side? I know you do. And I'd like at some point to hear them. Certainly. Their comparator is a man violating the dress code with a woman who follows the dress code. That is wrong. Our comparator is a man who violates the dress code with a woman who violates the dress code. Now, the reason we know theirs is wrong, because if you were claiming transgender status discrimination rather than sex discrimination, you would compare a transgender and a non-transgender employee, which is exactly what they do, which proves that they're adding a different classification into the statute that Congress has not added. And what they say is the reason we know you're wrong. I'm not saying this, nor am I assuming any other person thinks this. I'm just saying that this is what I hear, that if you are right, then miscegenation does not fall within this statute, that Jews marrying Catholics does not fall within this statute, that any instance where people say, or many instances where they say, I fired this man because he wasn't a woman, I fired the woman because it's a man's job, it's okay, as long as sometimes you'd fire a man because it's a woman's job. You see the point. I do. Justice Breyer? Now, what is your answer to that? There is no non-racist reason why you would fire the employee in the interracial marriage. There is no non-religious reason. I happen to know people. I won't say who they are. But there are people in my life I have heard say, being Jewish is fine, being Catholic is fine, just don't get married. But that's a religious reason. Now, in this case, does that mean it falls outside the statute that forbids discrimination because of religion? Yes, because Title VII allows you to recognize that there are differences between women and men, and that an employer, switching back to the first case, could terminate a same-sex couple or an employee who's married to a same-sex partner, maybe because they are Catholic and they believe that marriage is only between one man and one woman, and sex doesn't have anything to do with it. Let me give you an example here. That's a ministerial exception that already exists. Ministerial exception if the employer is a church, but not if the employer is a Christian businessman like Mr. Rost. But there's still religious exceptions that the court has read into a lot of statutes. Putting that aside, your example, very powerful, women in a shelter who you say, if we accept his argument, will have to be guarded by or counseled by a transgendered woman. But isn't that exactly like Dohart? And there we said, you can have, you can't have sex-specific guarding of prisoners unless you have a BFOQ. And there they found that it was a BFOQ to make only men guard men and women only guard women. So I'm not quite sure that I understand your parade of horribles. Because under Mr. Cole's theory, BFOQs have to go too. Say that you have a BFOQ. But it's statutory. They can't put, they can't wish it away, but go ahead. If you have a BFOQ that says only a man can apply for this position, he would say that a woman who is transgender is a man and therefore is eligible for that position and no BFOQ in the world would be able to keep them out of that position. The problem is they're adding transgender classification to a statute where Congress has never added it. No, what they're doing is saying, if there is an independent reason why a man who's transgendered can't have a job that a woman has, then that reason is good enough. You don't have to hire them. But if there is no reason why your gender should marry in the work you're doing, why should you not be hired? That's a very different proposition. Let's go back to the women's overnight shelter. Assume for a moment that the employer had a BFOQ that only women counselors would be able to counsel and stay overnight with the women who have been abused. How does that fit with BFOQ? BFOQ is a very narrow category. I agree, but they're applying it broadly. And I'm using Justice Sotomayor's example. Assume that there's a BFOQ for that and that someone would allow that. Their position is that it's stereotyping not to treat the man who identifies as a woman as a woman. They're arguing that but for the fact that they were born as a man, they could take that woman's position. So there is no BFOQ, there is no religious requirement that would stop and draw the line at the argument that they're making. All of the distinctions between men and women are gone forever. And that's the plain text of the statute. Would you wish to address Judge Flaum's argument, joined by Judge Ripple, which again is a very thoughtful position too, that there may be dual causes here, but the fact that sex is under consideration, even as narrowly construed, is enough to draw us within the statute. I think that line drawing inquiries happen all the time in Title VII. And it's entirely appropriate for a judge to instruct the finder of fact to draw that line, and the line that has to be drawn based on Title VII's language is whether women are being treated less favorably than similarly situated men because of sex. And sometimes it'll fall on the line, sometimes it won't. Consider Kagan I think, Mr. Birch, that that's not quite right. Women should be treated less differently than men. You're making Title VII into a statute about groups. But Title VII is not a statute about groups. Roberts That's helpful, but I'm also curious what you have to say, Mr. Birch. Birch Yeah, let's put both of those together, individual and that concept. Say that you have a woman who identifies as a man, and they're working at an employer and they get pregnant. They would be entitled to the same pregnancy benefits as any of the women at work because that, if they didn't get it, that would be sexist. But if the employer applied a sex-specific dress code or sex-specific showers and restrooms, that would not be a statutory violation because of their biological differences, men and women are not similarly situated and they're no one is being treated disadvantageously compared to someone else. So you could have an employee who might have a sex discrimination claim, but they can't bring a claim because of their transgender status. You might have someone who doesn't. Those are the things that we let juries work out, and there's nothing unusual about that in the context of Title VII. Kagan I think, Mr. Birch, maybe you answered Justice Gorsuch's question now. You didn't answer mine. Birch Okay. Title VII is a statute about individuals and whether individuals are being treated differently because of his or her sex. It's not a statute about, well, in the aggregate, does this act disadvantage men versus women or women versus men? It's a statute that uses the word individual twice and says, is a particular person being treated differently because of her sex? And here, Ms. Stevens was being treated differently because of her sex. And this was Judge Flom's point in that opinion, is that it's as simple as looking at the language of the statute, applying it to a particular individual, which Title VII insists that you do, and coming up with the obvious answer. Yes. If she had not been a bio – if she had not been assigned at birth the sex that she was assigned at birth, she would have been treated differently. Bursch We agree with the individual treatment. That's why in OnCal, this Court said, basically in the context of a male-only workforce, that the plaintiff had a cause of action because he was being treated differently than a woman in his position would have been, a hypothetical comparator, to get back to some of Justice Ginsburg's questions. Even if there are no women on the site, you still have that hypothetical comparator. Here, it's individual, too. But all the employer does in enforcing a sex-specific dress code applied neutrally to everyone recognizes that there's differences between men and women. And if you say that Tom Ross can't do that, then there is no – Kagan Are you pinning your answer on the fact of a dress code? Would your answer be the same if there were no dress code? And Ms. Stevens had just been fired for being transgender? Because all your arguments in your brief – I mean, you keep talking in your brief, as you do here, about the dress code, but the arguments that you make are arguments that would allow the employer to fire Ms. Stevens for being transgender, irrespective of whether there was a dress code. Bursch Here's the reason why, Justice Kagan. Kagan The why what? That the arguments do go that far. Bursch Well, that the arguments apply in both situations.  Kagan If there's a dress code or if there's not a dress code. Bursch Because if this Court allows a sex-specific dress code because it acknowledges the differences between men and women, it's no different if an employer without a dress code imposes the same policy on an informal basis. It doesn't change the fact that women are not being treated worse than men. As Ms. Carlin said, it doesn't treat her worse than – or it doesn't treat men worse than women that we wear a tie in this courtroom and that women do not. Sex-specific policies acknowledge that there are differences. So whether the sex code – or the sex-specific dress code is in place or not, employers have that latitude. Now, some jurisdictions, like the District of Columbia, have taken that latitude that Title VII gives away from employers. It says that you cannot, for example, treat someone differently based on their personal appearance. But otherwise, when it comes to dress codes, grooming codes, opposite-sex facilities and all those types of things, everyone would have understood Title VII at the time of its enactment as those things being equal treatment and not disfavoring either sex over the other, whether on a group basis or an individual basis. It doesn't make any difference. The problem here is that under their theory, the Federal agency that brought this claim and then an unelected panel in the Sixth Circuit changed the law. They added a transgender classification, applied it to a business retroactively, and what's more, the Sixth Circuit said that sex itself is a stereotype. And Mr. Cole agrees with that 100 percent. Everything that he said this morning, sex itself is a stereotype. You can never treat a man who identifies as a woman differently, because to do that is sex discrimination. When you do that, there is no sex discrimination standard under Title VII anymore. It's been completely blown up. One other point on the restroom scenario, gender identity is a broad concept. You could have a male employee who identifies as a woman, but doesn't dress as a woman, looks like a man, showing up in the shower and the locker room. And again, the employer wouldn't be able to do anything about that, because under Mr. Cole's theory, but for the fact he was a man, he could be there. And it's stereotyping to say men cannot be in the women's bathroom. Thank you. Roberts. General Francisco. Francisco, Mr. Chief Justice, and may it please the Court. I'd like to make three basic points aimed at basically addressing Justice Gorsuch's comment that this is a close textual case, and I would like to respectfully argue that I don't think it's that close for three reasons. Oh, neither side ever thinks a case is close. Judges always do, don't they? And the first, Your Honor, is the one that I was talking about earlier, that sex and gender identity, like sex and sexual orientation, are different traits. They're defined. They have different definitions. As my friend just said, he agrees that they're different traits. And there's a reason why, when Congress wants to prohibit discrimination based on the traits of sexual orientation and gender identity, it lists them separately. It doesn't define sex as including these traits. It's because Congress has recognized there are different traits. So as long as you treat men and women with the same different trait, exactly the same, regardless of their sex, you're not discriminating against them because of their sex. The second and related textual issue is that the standard for determining whether or not you're discriminating against somebody because he's a man or because she's a woman, is that you're treating that person differently than a similarly situated person of the opposite sex and taking an adverse employment action against them as a result. So the threshold question is always, are the two people that you're comparing actually similarly situated? Now, my friends on the other side assert that a transgender man is in fact similarly situated to a cisgender man, just like they assert that a gay woman is similarly situated to a straight man, but that is manifestly not true. Because with respect to the transgender issue, the difference between a transgender man and a cisgender man is that one identifies with his biological sex and the other identifies with the opposite of his biological sex. And that is a very meaningful difference that is not grounded on stereotypes. It's simply grounded on a difference between a transgender man and a cisgender man. Likewise with sexual orientation, the difference between a gay man and a straight woman is their sexual orientation. And that has nothing to do with stereotypes. It has nothing to do with whether one is better or worse than the other. It's just a different type of relationship. A great deal of the arguments here could be cast as stereotypes though, right? That the plaintiff in this case or that case doesn't conform to male or female stereotypes. And as I understand your brief, you accept that argument. And that those are good claims without respect to comparators of opposite sex. And if that's the case, what's the real difference here between the two sides? I mean, we've- Right. Except there's some delta, but it seems smaller than might first appear. Sure. And what I would say the difference is at what stage of the analysis you're doing it. The place that stereotypes come up are when you're figuring out whether two people are in fact similarly situated. An aggressive man, take Price Waterhouse, an aggressive man is similarly situated to an aggressive woman. They have the exact same trait, aggressiveness, and the only difference is that stereotypical view that women shouldn't be aggressive. But a transgender man and a cisgender man do not ever share the same trait in the first place, because one identifies with his biological sex, the other identifies with the opposite of his biological sex. And that is simply a different trait that is not grounded in any kind of stereotype. And a gay man is not similarly situated to a straight woman for exactly the same reason. And I think one could argue just the opposite, that there is another trait in Price Waterhouse, and the trait is conformity to traditional gender roles. So your argument would suggest, no, we shouldn't look at the aggressive woman and the aggressive man. We should instead say, no, there is this other thing which is conformity to gender roles. Right. We should really look at whether the employer treats the same, the aggressive woman and the docile man, the docile effeminate man. And if the employer treats the aggressive woman in the same way that the employer treats the effeminate man, they're both fired, then the employer is off the hook. Now, you yourself say that that's not right, that in fact, that's double discrimination and the employer is on the hook twice. But it seems to me that the exact same analysis applies, because there is this independent trait, which is just a little bit different from the independent trait here. Here, the independent trait, so-called, that you say, is the transgender identity. There, the independent trait was the refusal to conform to traditional gender roles. Right. And I dis — the reason I disagree with that analysis, Your Honors, because I don't think that Price Waterhouse creates some kind of freestanding stereotype claim. What it prohibits is stereotypes that show that you're treating similarly situated men and women differently. So in Price Waterhouse — I thought you answered the question that — that Price Waterhouse would not have treated men who were not sufficiently macho in the same way that they treated women who were not sufficiently feminine. No, Your Honor. I believe we said the opposite of that in our brief. And if there was — Well, that would be okay. Yeah. We said the opposite of that in our brief. And I could have — you have this — But they couldn't rely on this for both cases. Yes. They couldn't rely on the stereotype that the woman doesn't fit. They couldn't rely on the stereotype that the men didn't fit, although the cases have said that the object of Title VII was to get at the entire spectrum of sex stereotypes. And so as we read Price Waterhouse, which I have no quarrel with in the slightest, if you treat an aggressive woman worse than an aggressive man, you are violating Title VII because you're treating similarly situated people differently. Applying that here, if you treat a transgender man exactly the same as you treat a transgender woman, regardless of their sex, you're likewise not discriminating against them because of their sex. I want to know on a totally separate argument. One, it's only my characterization, not anybody else's. But I do characterize one set of arguments that you've been through as trying to work with the language of the statute. All right? And on the one hand, you have — these are individuals, individuals four times. And on the other hand, you have — and the arguments that were made here, and on the other hand, arguments on the other side. I'm putting that to the side. Then there are the horribles, okay? And we've discussed that at length. I'm putting that to the side. Then I say, well, there seems to be a third set in some of these briefs. Regardless of the first two, Congress — and that's what I think the dissenting judge was saying, it's a good point. I'm not saying it's a winning point, which is what I want to know. That Congress wouldn't have dreamt of this when it passed the statute. All right? I heard you say, I think, we're not relying on that. Is that so? The government is not relying on that. No, we are relying on it in this sense. One, we think it fortifies our other arguments, but I know you don't — Of course it does. I know you don't want me to push on that, so I'm not going to push on that. We're relying it on the sense that to the extent there is any ambiguity here, we think it is strongly dispelled by the history of these statutes. And I want to address that updating issue, because it's a very important question. And here, by updating it in the way that my friends on the other side would have you update it, they're actually undermining the manner in which Congress has traditionally considered updating it. If you look at ENDA, which I think refers to the Employment Non-Discrimination Act, for nearly a decade now, when Congress has looked and considered expanding the scope of the liability provisions, it has acknowledged that there are religious liberty issues at stake. And it wants to be able to take those into account, too. If you look at the states, they've often come to very similar compromises where they've found peace amongst otherwise very — On it. — groups of very different views. But if you resolve this issue judicially, you're essentially delivering, and I hate to use these types of terms, but a complete victory to one side of the fight and nothing to the other side of the fight. You're upsetting that legislative balance. I think that is an argument in your favor. Moreover, I think this whole category is the elephant in the room. And I think it is actually — That was the third point I was going to make to Justice Breyer. Well, all right. I think it is. But then on the other side of what you're saying is the following, which is abstract but no more so. In the 60s, we were only 10 years away from where people who were real slaves and discriminated against obtained a degree of freedom. And these statutes were all part of a civil rights movement that was designed to give, include, in our society, people who had been truly discriminated against for the worst of reasons. And at that time, this civil rights statute, when it was passed, would have put in the category gay people, transgender people, of people who were suffering terrible discrimination. And over time, this Court has moved away from that view, finding it unconstitutional. And now, doesn't that fact, which is an overwhelming fact to me, about the nature of the country under law, argue that that's a change? That's a change that both explains why they didn't put it in initially and explains why we should, other things being equal, interpret it to include gay people and transgender people now? No, Your Honor. For a couple of reasons, I would argue against that. And again, I'm going to put the text to the one side, but though I do think that that is our strongest argument, I actually find it troubling for courts to take that approach, because I actually think it deprives the people of the ability to struggle with these issues democratically. And I think it is very important, when we have these kinds of big changes, that we actually convince one another that this is the right thing to do. And when courts pretend to do that, it's not the right thing to do. No one ever thought that sexual harassment was encompassed by discrimination on the basis of sex back in 1964. It wasn't until a book was written in the middle 70s bringing that out. And now we say, of course, harassing someone, subjecting her to terms and conditions of employment she would not encounter if she were a male, that is sex discrimination, but it wasn't recognized to be such in the beginning. And, Your Honor, I think that that is a straightforward application of Title VII's text with respect to what I was talking about with Justice Breyer, where we were putting the text aside. I think it is important to allow the democratic processes to resolve these issues so we have a stable resolution of the issue and one that takes into account what everybody would agree are legitimate interests on all sides. In Obergefell, this Court made very clear that there were good and decent people who had different views with respect to gay marriage, and they should be respected. The legislative process is the process that allows those views to be respected, as well as the very powerful views of my friends on the other side, which also should be respected. Sotomayor, may I just ask, at what point does a court continue to permit invidious discrimination against groups that where we have a difference of opinion, we believe the language of the statute is clear? I think Justice Breyer was right that Title VII, the Civil Rights Act, all of our acts were born from the desire to ensure that we treated people equally and not on the basis of invidious reasons. And we can't deny that homosexuals are being fired merely for being who they are, and not because of religious reasons, not because they're performing their jobs poorly, not because they can't do whatever is required of a position, but merely because they're a suspect class to some people. They may have power in some regions, but they're still being beaten, they're still being ostracized from certain things. At what point does a court say, Congress spoke about this, the original Congress who wrote this statute told us what they meant, they used clear words, and regardless of what others may have thought over time, it's very clear that what's happening fits those words. At what point do we say we have to step in? I guess my answer, Your Honor, would be at the point when Congress actually addresses the issue. And the main argument that we are making, and have been making from beginning to end, is that Congress has not resolved this issue because sex, gender identity, sex, sexual orientation are different traits. General, these are some thoughtful responses that you've given to this set of questions. But in responding to Justice Breyer, you said, if we thought that there was a clear application of the statute, so I would just ask you, if you thought that this was a clear application of the statute, in the same way that sexual harassment was a clear application of the statute, even though nobody recognized it at the time, if you thought that this was a clear application of the statute, would we have to come out against you? Yes, Your Honor. If the statute is unambiguously against me, you have to rule against me. I actually think that the statute is unambiguously in my favor for the reasons I was given, and the third reason, which is the one that Justice Breyer alluded to, Justice Scalia's great line about how we don't hide elephants in mouse holes. Everybody here agrees that Congress never thought that by prohibiting discrimination based on sex, they would also be prohibiting discrimination based on two very different traits, sexual orientation and gender identity. My friends would have this Court essentially reach that same result indirectly. I think all of the textual arguments cut in our favor straightaway, but to the extent there's any doubt, there's no way to find that elephant in this mouse hole. Thank you, Your Honor. Roberts. Thank you, counsel. Five minutes, Mr. Cole. Thank you. Interpreting a statute is not depriving the democratic process. It is doing what the Court is supposed to do within the democratic process. And, of course, if the democratic process disagrees with the Court's interpretation of the statute, it can change it. So there's no deprivation of the democratic process here. Secondly, the purpose of Title VII, as this Court defined it, was to make sex irrelevant to people's ability to succeed at work. To make sex irrelevant to people's ability to succeed at work. When Harris Holmes fired Amy Stevens because it learned about her sex assigned at birth being different from her gender identity, it did not make sex irrelevant to her ability to succeed at work. It made it determinative. And think about it this way. If Harris Holmes fired a man because he was a man, that would be sex discrimination. If it fired an employee because he was insufficiently masculine, that would clearly be sex discrimination. In this case, Harris Holmes fired Amy Stevens because he thought she is a man who is insufficiently masculine. That too must be sex discrimination. She's not seeking any special protection. She is seeking, and all transgender people are seeking, the same protection that everybody else gets under the law. This Court 30 years ago said in Pricewaterhouse, we are beyond the day when an employer could evaluate employees by insisting that they match the stereotypes associated with their group. We are certainly beyond that day today as well. And what Harris Holmes did was to insist that she match the stereotypes associated with her group. That's impermissible under this Court's precedence. It's impermissible under the littler terms of the statute. And this Court should rule for Amy Stevens. Thank you. Roberts. Thank you, counsel. The case is submitted.